No. 87–1017.   MONROE v. BUTLER, WARDEN.   Crim. Dist. Ct., Orleans Parish, La.   Certiorari denied.

JUSTICE BRENNAN, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976), I would grant certiorari and vacate the death sentence in this case.

JUSTICE MARSHALL, dissenting.

I continue to believe that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments.   *Gregg* v. *Georgia*, 428 U. S. 153, 231–241 (1976) (MARSHALL, J., dissenting).   But even if I did not hold this view, I would grant this petition for certiorari because the state courts refused to grant petitioner appropriate relief for

the State's violation of his rights under *Brady* v. *Maryland*, 373 U. S. 83 (1963). In so doing, the state courts countenanced impermissible official conduct and left the victim of this conduct without effective constitutional protection.

## I

In 1980, petitioner Ronald Monroe was brought to trial in New Orleans for the murder of Lenora Collins, a neighbor. The State's case against petitioner consisted solely of eyewitness identifications by the victim's two children, both of whom were present when an assailant broke into their mother's bedroom and stabbed her. There was no physical evidence linking petitioner to the offense. The jury, apparently crediting the testimony of the two children, who at the time of the murder were aged 12 and 11, found petitioner guilty of first-degree murder and unanimously recommended the death sentence.

Six months after Monroe's conviction, Detective Joseph Gallardo of the Pontiac, Michigan, Police Department contacted a member of the New Orleans Police Department to relate information pertinent to the murder of Lenora Collins. While investigating one George Stinson's murder of his common-law wife, Detective Gallardo had received a tip suggesting that Stinson also may have murdered Collins, who was Stinson's previous wife. This tip appeared plausible because both women had died from stab wounds to the neck and chest. Two months after imparting this information, Gallardo again called the New Orleans police. This time, Gallardo told Sergeant John McKenzie about a recent interview he had conducted with Stinson's cellmate. In the interview, the cellmate had quoted Stinson as first confessing to the Michigan murder and then stating that "the same thing happened" to Collins. The cellmate also had reported that Stinson had confessed to threatening his stepchildren into identifying petitioner as their mother's killer. According to Gallardo, the Michigan case also contained a suggestion of witness intimidation.

All of this information was transmitted to the New Orleans detectives who had handled the investigation of Collins' murder. These detectives did not make any further inquiries relating to the Collins case. Neither did the detectives inform petitioner or his counsel of Gallardo's communications. Not until two years later did petitioner's counsel discover, through independent investiga-

tion, that Gallardo had made these statements to the New Orleans police.

Petitioner thereupon filed a motion in the Orleans Parish Criminal District Court seeking release or retrial. Petitioner alleged that the State had violated his constitutional rights by failing to disclose the information Gallardo had given to the New Orleans police. The Criminal District Court denied petitioner's motion without an evidentiary hearing, asserting that the new evidence was not sufficiently material to support relief. The Louisiana Supreme Court denied review. *State ex rel. Monroe* v. *Maggio*, 444 So. 2d 606 (1984).

Approximately two months later, the United States District Court for the Eastern District of Louisiana granted petitioner's application for habeas corpus relief. Relying in part on testimony given at an evidentiary hearing, the District Court held that the State had violated petitioner's constitutional rights under *Brady* v. *Maryland, supra,* and *United States* v. *Agurs,* 427 U. S. 97 (1976), by failing to disclose the information obtained from Gallardo. The District Court found that this evidence "create[d] a reasonable doubt as to Monroe's guilt that did not previously exist." App. to Pet. for Cert. 5c. The court further found that the State's responsibility to disclose such evidence continued past the point of conviction. The court explained that "it is fundamentally unfair and contrary to society's notions of justice for a prosecutor to withhold material exculpatory evidence which he acquires while the defendant is entitled to file a motion for a new trial." *Id.,* at 3c. Having found a *Brady* violation, the District Court nonetheless refused petitioner's request for an order directing immediate release or retrial. The court instead remitted the case to the state courts so that they could provide appropriate postconviction relief. Petitioner appealed from the remedial aspect of this judgment, but the United States Court of Appeals for the Fifth Circuit affirmed. *Monroe* v. *Blackburn,* 748 F. 2d 958 (1984). This Court denied petitioner's application for a writ of certiorari. I dissented then from the Court's failure to review the relief afforded petitioner. See *Monroe* v. *Blackburn,* 476 U. S. 1145 (1986).

On remand, the Orleans Parish Criminal District Court once again denied petitioner's motion for release or retrial. The state court first expressly rejected the Federal District Court's prior determination that a *Brady* violation had occurred. The state

court reasoned that *Brady* did not apply to evidence obtained by state officials after a defendant's trial: in the words of the state court, "it is impossible to accuse the prosecution of 'suppressing' this material since it did not exist at the time of trial and therefore could not have been suppressed." App. to Pet. for Cert. 2a. The court then held that the new evidence did not entitle petitioner to a new trial under state law. A new trial is required under Louisiana law whenever newly discovered evidence, if introduced at the prior trial, would probably have changed the verdict of guilty. The state court found that the new evidence in this case, which it termed an "ambiguous utterance by Stinson," would not have changed the jury verdict. *Id.*, at 3a. The Louisiana Supreme Court denied review of the Criminal District Court's decision, and petitioner again applied for certiorari.

## II

The Criminal District Court's pronouncement that no *Brady* violation occurred in this case is insupportable. On application for habeas corpus relief, a Federal District Court previously had determined that the State's failure to disclose the exculpatory information received from Detective Gallardo constituted a *Brady* violation. The state court had no authority to reconsider or redecide this issue. Once a federal court has determined a federal question in a case, a state court must recognize and give effect to that determination. As this Court stated decades ago:

> "[A] right claimed under the Federal Constitution, finally adjudicated in the Federal courts, can never be taken away or impaired by state decisions.
>
> .    .    .    .    .
>
> ". . . Any other conclusion strikes down the very foundation of the doctrine of *res judicata*, and permits the state court to deprive a party of the benefit of its most important principle, and is a virtual abandonment of the final power of the Federal courts to protect all who come before them relying upon rights guaranteed by the Federal Constitution and established by the judgments of the Federal courts." *Deposit Bank* v. *Frankfort*, 191 U. S. 499, 517, 520 (1903).

See also *Stoll* v. *Gottlieb*, 305 U. S. 165, 170–171 (1938); *Myers* v. *International Trust Co.*, 263 U. S. 64, 69, 73 (1923). I would have thought this rule too long established to require reiteration.

By flouting it here, and ignoring the determination of the Federal District Court that state officials had committed a *Brady* violation, the state court acted beyond the scope of its authority and in disregard of settled law.

Given the finding of the Federal District Court that state officials had committed a *Brady* violation when they suppressed the evidence suggesting that George Stinson rather than petitioner had murdered Lenora Collins, the state court was required to order the release or retrial of petitioner. Until now, the invariable remedy for a prosecutor's or police officer's suppression of material exculpatory evidence has been an order directing release or retrial. The State has not pointed to a single case involving a different remedy, and I am aware of none. Still, the State argues that because the *Brady* violation at issue here occurred after petitioner's conviction, the state courts fully remedied the violation by giving petitioner an opportunity to demonstrate that the new evidence entitled him to a second trial under normal principles of state law. This approach, however, disregards one of the most fundamental aspects of this Court's *Brady* jurisprudence. This Court consistently has drawn a sharp distinction between newly discovered evidence suppressed by the State and newly discovered evidence obtained from a neutral source; the Court has reasoned that if these two categories of evidence were treated in the same manner, "there would be no special significance to the prosecutor's obligation to serve the cause of justice." *United States v. Agurs, supra,* at 111. To "remedy" a postconviction *Brady* violation merely by evaluating the suppressed evidence under the state-law standard governing motions for a new trial is to violate this established principle; such a remedy treats the evidence as if it had derived from a neutral source and thereby ignores the dereliction of state officials. In so doing, this remedy removes from the State any incentive to disclose material exculpatory evidence gained after conviction and trivializes the constitutional right recognized by *Brady* and its progeny. Because I do not believe that this Court should tolerate such a dilution of the *Brady* rule, especially in the context of a capital case in which the withheld evidence is strongly exculpatory, I dissent from the denial of certiorari.